# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

HAKIM RAMATOOLA,

     Petitioner,

v.                                                            CASE NO:  8:13-CV-448-T-30EAJ

SECRETARY, DEPARTMENT OF
CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

     Respondents.

_____/

## ORDER

Petitioner, an inmate in the Florida penal system proceeding *pro se*, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. #1).  The Court has considered the petition and Respondent's Response (Dkt. #7).  Upon review, the Court determines that the petition should be denied.

## BACKGROUND

The following background facts were taken from Petitioner Hakim Ramatoola's ("Ramatoola") brief on direct appeal.  Ramatoola was convicted in the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, of the following offenses:

(1)    Capital Sexual Battery between July 11, 1999 and July 10, 2001 [age 10-11] by penetration of or union with the vagina of AMR by the penis of the Appellant.

(2)    Sexual Battery By Person in Familial or Custodial Authority between July 11, 2001 and July 13, 2007 [age 12-18] by penetration of or union with the vagina of AMR and the penis of the Appellant.

(3)    Lewd and Lascivious Molestation between July 1999 and July 10, 2001 [age 10-11] by touching the breasts, genitals or genital area of AMR.

(4)    Lew and Lascivious Molestation between July 11, 2001 and July 10, 2005 [age 12-15] by touching the breasts, genitals or genital area of AMR.

(5)    Lewd or Lascivious Exhibition between July 11, 1999 and July 10, 2005 [age 12-15] by masturbating in the presence of AMR.

In the state's brief on direct appeal, the following information was added:

The victim testified that the Appellant started rubbing himself on her from the time she was a child of six or seven.  (T287).  It started when she and her brother would wrestle with her stepfather.  Appellant would get an erection and start rubbing himself on the victim's vagina over her clothing.  She testified that "when he had an erection, it would be rubbed up against me and it hurt."  (T287-8).  The "wrestling" activity started when she was young, happened more than once, and continued over time.  (T294).

The victim testified regarding an incident when she was eight or nine in which she was taking a bath with her brother and father.  The children were wearing swimsuits.  After her mom took her brother away, she and her stepfather ended up with no clothes on and the Appellant started rubbing his penis on her vagina.  She testified that there was skin to skin contact between his penis and her vagina.  (T289-290).

The victim described another incident that occurred while she was watching the movie Zorro with the Appellant.  The Appellant start massaging her body front and back.  He massaged her breasts and then moved under her pants and touched her vagina with his hands.  (T293).  His hand made skin to skin contact with her vagina.  (T294).  After he was touching her with his hands he started taking off her clothes and ended up touching her with his penis.  He was on top of her holding his penis while it was happening.  (T383)

When asked to describe the incident the victim testified as follows:

A      Well, I just remember he was taking off my clothes and first I made him stop and then he did for a little bit for just a couple of minutes and then he started back again at different points in the movie like, you know, romantic scenes or things like that.  I guess it would turn him on and he started back again and he pulled out his penis and I know he had an erection now and started rubbing it on me.

Q      And where did he rub it on you?

A      My vagina.

Q      And did he penetrate your vagina during that period of time?

A      No.

(T296).  The Zorro incident was the first time it happened.  The victim testified that there were 50 to 100 similar incidents that happened while they were watching movies and continued to happen until the time of Appellant's arrest.  (T383).  The victim testified that she was certain she was under 12 when the described Zorro movie incident occurred.  (T293, 297).

## THE PRESENT PETITION

Ramatoola filed his petition before this Court on February 19, 2013.  The Respondent agrees that the petition is timely and all claims have been properly exhausted in state court.

Ramatoola raises the following grounds:

**Ground One:**      The trial court erred in denying petitioner's requested jury instruction.

**Ground Two:**      The evidence was insufficient to support a conviction on counts one and three for capital sexual battery and lewd and lascivious molestation of a victim under age twelve.

**Ground Three:**      The trial court erred in allowing a nurse practitioner to testify to the hearsay statements of the victim.

**Ground Four:**     Trial counsel was ineffective for failing to move for a statement of particulars.

**Ground Five:**     Trial counsel was ineffective for failing to object to the admission of the DNA evidence introduced at trial.

**Ground Six:**     Trial counsel was ineffective for failing to object to the admission of expert DNA testimony introduced at trial.

**Ground Seven:**     Trial counsel was ineffective for failing for object to the opinion testimony of penetration by a non-expert witness.

**Ground Eight:**     Trial counsel was ineffective for having the court suppress evidence of domestic violence.

**Ground Nine:**     The trial was unfair and trial counsel was ineffective for the reasons stated in Grounds One through Eight.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective as of April 24, 1996, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a). The Supreme Court has cautioned that § 2254 does not make federal courts "forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 77 L.Ed.2d 1090 (1983).

Where a state court initially considers the issues raised in the petition and enters a decision on the merits, Section 2254(d) governs the review of those claims. *See Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L.Ed.2d 9 (2001). A federal court may grant a § 2254 petition only if (1) the state decision was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See Price v. Vincent,* 538 U.S. 634, 638, 123 S. Ct. 1848, 155 L.Ed.2d 877 (2003); *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005).

The Eleventh Circuit Court of Appeals discussed the meaning of the "contrary to" and "unreasonable application" clauses in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.*

Section 2254 establishes a highly deferential standard for reviewing state court judgments. *Parker v. Sec'y for the Dep't of Corr.*, 331 F.3d 764, 768 (11th Cir. 2003). If a federal court concludes that a state court applied federal law incorrectly, it may grant habeas relief only if that application was "objectively unreasonable." *Id. See also Yarborough v. Gentry*, 540 U.S. 1, 124 S. Ct. 1, 4, 157 L.Ed.2d 1 (2003). Moreover, under Section 2254(e)(1), a state court's factual findings shall be presumed correct, and the habeas petitioner can rebut the presumption of correctness only by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690.

Petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691-92. To meet this burden, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

## **DISCUSSION**

**Ground One:**       The trial court erred in denying petitioner's requested jury instruction.

In support of Ground One, Ramatoola argues that the trial court erred in not giving the 2002 standard jury instruction for sexual battery -- victim less than twelve, and instead giving the more current Florida standard jury instruction.  He argues:

> No where in the victim's testimony did she alleged any sexual activity occurring between July 11, 1999 and July 10, 2001.  Thus, it was necessary for the jury to be instructed to find out how old the victim was when the sexual activity occurred and was they between the charged dates.  Just instructing the jury that the victim was under 12 prejudiced the Petitioner, in that the Petitioner was charged with Sexual Battery, with the allegations starting at age 10 before 12.  The victim being 7, 8, or 9 does not prove the allegation in the charging information,  because none of it leads to the alleged charged offense dates of July 11, 1999 and July 10, 2001.

(Dkt. #1, p.5).

The trial court gave the new standard instruction which reads as follows:

> To prove the crime of sexual battery upon a person less than 12 years of age, as charged, the State must prove the following elements beyond a reasonable doubt:
> 1.       A.R.R. was less than 12 years old.

   2.  Hakim Ramatoola committed an act in which his sexual organ
      penetrated or had union with the vagina of A.R.R., and
   3.  Hakim Ramatoola was 18 years of age or older.
   However, any act done for bona fide medical purposes is not sexual
battery. "Union" means contact.

(Respondent's Exh. 001, p. 50 and 892-893).

This instruction explains to the jury in clear terms that to find Ramatoola guilty they

had to find that "ARR was less than 12 years old." Ramatoola's complaint has more to do

with the insufficiency of the evidence than the wording of the jury instruction. That

insufficiency complaint is addressed in Ground Two, but Ground One fails insofar as it

concerns the jury instruction given.

**<u>Ground Two:</u>**   The evidence was insufficient to support a conviction on counts one
       and three for capital sexual battery and lewd and lascivious molestation
       of a victim under age twelve.

   In support of Ground Two, Ramatoola argues:

   There is insufficient evidence to convict Petitioner on Counts I and III. There
   in [sic] NO competent substantial evidence that the alleged victim was
   between the ages of 10 and 11, and that the events occurred between July 11,
   1999 and July 10, 2001 in order to obtain and sustain a conviction on both
   counts of I and III.

(Dkt. #1, p. 7).

Habeas review of a claim of insufficiency of evidence requires this Court, after

viewing the evidence at the trial in the light most favorable to the prosecution, to determine

whether any rational trier of fact could have found the essential elements of the crime

charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979), *reh'g denied,*

444 U.S. 890 (1979). Many witnesses testified in the case, including testimony about DNA

testing, but the testimony of the victim alone was sufficient to support the conviction.  The

victim testified in part:

Q    With respect to things that were happening when you were younger, as you sit here today can you remember specifically every date and perhaps time of day that these things happened to you?

A    No.

Q    Can you remember general grades or age ranges that you were in?

A    Yes.

Q    And can you remember general places or times that these things happened?

A    Yes.

Q    Was [sic] there incidences with your stepfather where he would be wrestling with you and your brother?

A    Yes.

Q    And did that occur - - which residence did that occur at?

A    It occurred at 6210 Rolling Hammock Place.

Q    Okay.  And do you know approximately how old you were when that conduct started?

A    Around six or seven.

Q    All right.  Can you describe for the members of the jury what would happen when your stepfather was wrestling with you?

A    Well, I would be off by myself and him and my brother would come in and start play fighting and they'd start wrestling and somehow I always ended up getting dragged into it.  And I guess he got excited when it happened and he'd start rubbing himself on me.

Q       Okay.  At any point during the course of that wrestling, would he touch you anywhere on your body?

A       Yes.

Q       Can you describe the places he would touch?

A       Basically grabbing anywhere he could.

Q       Okay.  Do you specifically remember him touching different parts of your body?

A       Yes.

Q       What parts of your body do you remember him touching?

A       Well, when he had the erection, it would be rubbed up against me and it would hurt.

Q       Okay.  What party of your body?

A       My vagina.

Q       As you sit here today and are eighteen years old, you know what an erection is?

A       Yes.

Q       When you were six or seven years old, did you know that term?

A       No.

Q       What did you feel or what did you perceive was going on when that happened?

A       I had no idea.

Q       Okay.  But what specifically would you feel when the wrestling was going on?

A       Well, when he'd be rubbing up against me, it would hurt and I'd cry.

Q       Okay.  Now, at eighteen, do you realize that he had an erection during
        that time?

A       Yeah.

Q       Was that over or underneath your clothing?

A       When we wrestled, it was over my clothing.

Q       And was he wearing clothing when that was going on?

A       Yes.

Q       Do you recall an incident where your stepfather took a bath with you
        and your brother?

A       Yes.

Q       Do you know approximately how old you were when that happened?

A       I don't really remember.

Q       Do you know whether or not you were under the age of 12 when that
        happened?

A       I know I was.  Maybe eight or nine.

Q       And can you describe for the members of the jury what happened?
        Where was that, the apartment or Rolling Hammock Place?

A       The bath was at 6210 Rolling Hammock Place.

Q       How old were you when you moved from the apartment in Temple
        Terrace to Rolling Hammock Place?

A       I was in the third grade.

Q       Okay.  And I believe you had said a few minutes ago that in the third
        grade, you would have been eight years old?

A      Yeah.

Q      Describe the incident in the  -- when you took a bath, please.

A      Well, first we were all in there.  We were having fun.

Q      When you say we were all in there, who was all in there?

A      Me, my brother, and my dad and we were wearing our swim suits and my dad was wearing his clothes.  And I don't know why, but I don't remember -- I think my mom took my brother away and it was just the two of us.  I remember it was just the two of us at one point.

Q      And did anything happen while you were alone with your stepfather?

A      Yes.

Q      What happened?

A      Well, I know we both ended up with no clothes on.  I think he took my clothes off and he started rubbing his penis on me.

Q      Okay.  What part of your body did he rub his penis on?

A      My vagina.

Q      Any you said both your clothes were off?

A      Yeah.

Q      And was that actual skin to skin contact between his penis and your vagina?

A      Yes.

Q      Did he -- do you know what I mean when I say penetrate your vagina?

A      I know what you mean and he didn't.

Q      Okay.  Was he saying anything while he was doing that?

A He always told me he loved me.

Q And how did that -- now looking back as an eighteen year old, do you know whether or not he had an erection while that was going on?

A Yes

Q Did he ejaculate at that time?

A He didn't need to because he was using me.

Q Okay.  Do you know what the term ejaculate means?

A Yes.

Q So do you recall whether he ejaculated while you were in the bathroom?

A Yes.

Q Do you know where he ejaculated?

A Well, he was using me, but he didn't get off, not in the bath rub.

Q Okay.  And you were eight at that time?

A Around there.

Q Definitely under 12?

A Yes.

Q Do you remember, Miss Ramatoola, when you went through puberty and developed -- developed breasts and developed things that happen when a girl goes through puberty?

A I remember.

Q Approximately what age did you do that?

A I was thirteen I believe, but I might have been twelve.

Q       This time in the bathroom, had you gone through puberty at that time?

A       No.

Q       Other than the incidents that you described, were there other times that your stepfather touched you anywhere else on your body?

A       Well, yeah.

Q       Okay.  Were there -- was there an extent when you were watching a movie with him?

A       Yes.  I remember one night specifically we were watching Zorro and my mom and my brother are usually asleep when we were up late watching movies together and we were watching the movie and he started touching me, massaging my body.

Q       Where?

A       Everywhere.  First it was my back and then my front.

Q       When you say your front, what area are you talking about?

A       First my chest and then he started touching me.

Q       Now, before this incident where the movie -- in the movie Zorro, had he ever massaged you before?

A       Yes.

Q       Was that something he did regularly?

A       Yes.

Q       But the night -- was watching movies one of the things you all did together?

A       Yes.

Q       And did that continue over time?

A       Yes.

Q       When you say he was touching, did you call it your chest area?

A       Yes.

Q       Can you be as specific as you can with me and tell me exactly where on your front that he touched?

A       Well, first my breasts and then he moved down and it was under my pants.

Q       All right.  At that time had you gone through puberty and were you developed?

A       No.

Q       Do you know approximately how old you were when this Zorro movie incident took place?

A       Not really.

Q       Do you know if you were under the age of 12?

A       I know I was under 12.

Q       And do you know if that incident took place before or after the bathroom incident?

A       It was after.

Q       What about the wrestling?  Had that taken place before this?

A       The wrestling started when I was young, but it always happened.

Q       It happened more than once.

A       Yes.

Q       Did it continue over time?

A Yes.

Q When you were watching the movie, you said he touched you on your breasts.  Was that over or under your clothing?

A Both.

Q And you said he touched you underneath your pants?

A Yes.

Q Can you describe, please, specifically what he did?

A He was touching me using his hands, touched my vagina.

Q All right.  And did his actual - - did the skin of his hands make contact with the skin of your vagina?

A Yes.

Q Did that -- did those two things -- let's start with the breasts.  Did he ever touch your breasts after you were over the age of 12?

A Yes.

Q Can you remember any specific instances where that happened?

A No specific instances because he did it a lot.

Q All right.  What about the conduct you've described of touching you with his hand touching your vagina, did that ever happen after you turned 12 and were over the age of 12?

A Yes.

Q And again, can you remember any specific instances of that?

A He did a lot of that, too.

(Trial Transcript, Respondent's Exh. 1, pp. 286-295).

From this testimony, the jury could conclude that there were many incidents of skin to skin contact with the genitalia of the victim by Ramatoola over a period of time including the time charged in the information.  Therefore, this claim fails for lack of merit.

**Ground Three:**     The trial court erred in allowing a nurse practitioner to testify to the hearsay statements of the victim.

In support of Ground Three, Ramatoola argues that the trial court "abused its discretion by allowing an unqualified nurse practitioner, who conducted a forensic interview of AMR for law enforcement officials, to testify concerning AMR's statements to her."

A federal court in a habeas corpus case is not to review the trial court's actions in the admission of evidence.  *Lisenba v. California*, 314 U.S. 219 (1941).  It is for the state appellate court to determine whether an evidentiary error was committed and, if so, whether it was harmful.  This Court is only to determine whether any asserted evidentiary error was of such magnitude as to deny fundamental fairness to a petitioner.  *Hills v. Henderson*, 529 F. 2d 397 (5th Cir. 1976).   This Court may grant habeas relief only if the evidence "is material in the sense of a crucial, critical, highly significant factor."  *Osborne v. Wainwright*, 720 F. 2d 1237, 1238 (1983), citing *Hills*, 529 F. 2d at 401.

Here, the admission of the evidence was not deemed contrary to Florida law by the state appellate court.  And, in any event, the admission of the testimony was not crucial given the testimony of the victim and the other evidence in the case.  Therefore, this Ground fails.

**Ground Four:**    Trial counsel was ineffective for failing to move for a statement of particulars.

In support of Ground Four, Ramatoola argues that the charges overlap in time and therefore, "without specific offense dates, the convictions on all three (3) counts may violate Double Jeopardy."

This Ground fails for two reasons:  Each charged crime contains an element not contained in the other charges and therefore there is no double jeopardy, and trial counsel testified that she knew about the underlying factual allegations and did not need a statement of particulars.

The federal double jeopardy test is explained in *Blockburger v. United States*, 284 U.S. 299 (1932).  If a charged crime contains an element not contained in other charges, there can be no double jeopardy because it is a separate and distinct crime.  Each of the charges against Ramatoola contained an element that was not an element of the other charges. Therefore, the double jeopardy claim fails.

On the issue of trial counsel's failure to seek a bill of particulars, the post-conviction court took testimony at an evidentiary hearing.  Ramatoola's trial counsel testified that she was fully familiar with the allegations.  She took the victim's deposition and spoke with Ramatoola at length about the charges.  She explained that she had no need for a more specific statement of the charges.  The post-conviction court found this testimony to be credible and made a finding of fact that the failure to request a statement of particulars was

a reasonable strategic decision by counsel.  This finding of fact is reasonable in light of the evidence.

This Ground fails because there was no deficient performance by trial counsel.

**<u>Ground Five:</u>**　　　Trial counsel was ineffective for failing to object to the admission of the DNA evidence introduced at trial.

In support of Ground Five, Ramatoola contends that:

> Swabs of DNA evidence were presented into evidence at Petitioner's trial, however the package was not sealed (T. 579), and the swabs introduced to the jury did not have any identification on them to authenticate that the swabs were taken from the Petitioner.  The package containing the pillow overlay was not sealed (T. 619).  And as a result of the packages containing (unidentified) DNA evidence being open, not sealed, the state was not able to authenticate this evidence, thus rendering it inadmissible.

(Dkt. #1, pp. 19-20).

The state post-conviction court conducted an evidentiary hearing as to this Ground. Trial counsel, Ms. Frederiksen-Cherry, testified that she was aware that the DNA came from a package that was not sealed, swabs that were not identified, and an unsealed pillow overlay because prior to trial, she viewed the evidence with the state.  She testified every item of evidence discussed in this Ground was sealed at the time she viewed it and the seal was broken when she was present.  She further admitted that prior to the seal being broken, she had already received the results through discovery reflecting a match to Ramatoola.

The post-conviction court made a finding of fact that Ms. Frederiksen-Cherry did not believe she had any good faith basis to file a motion to suppress the DNA evidence.  The court further found that the DNA evidence was sealed at the time Ms. Frederiksen-Cherry

viewed the evidence with the state prior to trial.  With those findings of fact, which are binding on this Court, there is no basis to support this Ground and it fails.

**Ground Six:** Trial counsel was ineffective for failing to object to the admission of expert DNA testimony introduced at trial.

Ramatoola contends that his trial lawyer was ineffective for failing to object to the testimony of Kara Raymond, the state's DNA expert.  In support of Ground Six, Ramatoola asserts that "Ms. Raymond did not appear to know the technical names for the procedures and requirement used in DNA testing."  He also argues that Ms. Raymond failed to identify what type of DNA test was performed, the type of amplification process employed, and whether the tests were accepted in the relevant scientific community as reliable.

The post-conviction court took evidence on this issue from Ramatoola's trial counsel, Ms. Frederiksen-Cherry.   Ms. Frederiksen-Cherry testified as follows:

> If I recall right, this may have been the first time that this particular expert was qualified as a DNA expert.  And so we spent some extra time to make sure that she was competent to be qualified.
>
> In part of our requesting bench notes, what we always do is also request the background information, in particular the curriculum vitae of any expert, which I did in this case.  I also deposed Miss Raymond.  And after all of our discussions and her testimony, well I believed that she was qualified to testify.  I believe that Miss Hindman, I'm sure at trial, qualified her prior to her testimony.
>
> I know that there was [sic] some issues regarding inclusion and exclusion levels of her analysis under her RFU levels that we had discussed.  I don't think it was anything that caused me to believe that she wasn't qualified to testify.  I did not file a motion to prevent her from testifying, but I did not believe I had a good faith basis to do that.

But I will say that prior to the trial there were discussions about her testimony and I believe that we --in an effort to provide the jury with the important and substantive data and to have a fair cross-examination, I know that we spent a significant amount of time prior to the trial talking with Judge Fuente, to each other, and Miss Raymond, so that we could make sure that that evidence was presented in a fashion that would be understandable to the jury, yet I believe the testimony was quite lengthy as it was, but essentially make sure that each side was able to get all the information out, yet still making sure that it was not repetitive and needless I guess for the jury.

So we did have discussions.  Mr. Ramatoola was present for some of them regarding the presentation and the order of the DNA evidence.  But I don't recall having any basis to believe that she wasn't a competent expert in her field.

(Post-Conviction Court Order, T. 90-91)

From the above testimony, the post-conviction court found that Ms. Frederiksen-Cherry did not make the alleged objection because she believed the DNA expert was a competent expert in her field.  That finding of fact is well supported by the testimony and is binding on this Court.  Therefore, this Ground has no merit.

**<u>Ground Seven:</u>**      Trial counsel was ineffective for failing for object to the opinion testimony of penetration by a non-expert witness.

In support of Ground Seven, Ramatoola contends that Sandra Shulman was not an expert witness, and was not qualified to speak about how "hymnal [sic] breakage and their [sic] causes.  Counsel's inaction prejudiced the Petitioner in that, Miss Shulman erroneous statement could have led the jury to believing [sic] that the victim hymnal [sic] breakage was caused <u>only</u> by the sexual allegation against the Petitioner."

Contrary to Ramatoola's assertion, Ms. Shulman was properly qualified as an expert in the field of sexual assault examinations.  Prior to her substantive testimony, the following testimony was given:

Q      Ma'am, how are you employed?

A      I'm employed as a -- is an advanced registered nurse practitioner with the child protection team University of South Florida School of Medicine Department of Pediatrics.

Q      And how long have you been employed at that job?

A      In that particular job, 17 years.

Q      And before coming to work for the Child Protection Team, what sort of work did you do?

A      I also was with the child protection team at the University of Miami for two years.  I have done general pediatrics as well as neonatal.

Q      How long have you been a nurse?

A      A nurse?  Thirty-two years.

Q      And Ms. Shulman, in order to become a nurse, what sort of education did you have?

A      A nurse or nurse practitioner?

Q      A nurse practitioner.  I apologize.

A      Nurse practitioner -- I've been a nurse practitioner for 29 years.  In addition to a Bachelor of Science in Nursing, it was additional schooling also done at the University of Miami.

Q      So there's a difference between a nurse and nurse practitioner?

A      Yes.

Q      What's the difference?

A      The difference is advanced training in the area of assessment, diagnosis
       and treatment.

Q      And you said you've been a nurse practitioner for 29 years?

A      Yes.

Q      As a part of your training to become a nurse or nurse practitioner, what
       sort of clinical experience do you have to have or have you had in these
       last 29 years?

A      After becoming a nurse practitioner?

Q      Yes, ma'am.

A      Specific to the area of child abuse and neglect, a lot of it is on the job
       training.  There's additional training offered in the way of continuing
       education.  I've attended  conferences through APSAC which is the
       American Professional Society for Child Abuse and Neglect for the
       North American Society for child and adolescent gynecology.  I've
       taken the Florida Attorney General's course for forensic sexual abuse
       examiners at least three times.

Q      How many sexual assault exams if you can -- if you know or if you can
       possibly estimate, how many sexual assault exams have you done in the
       last 29 years?

A      I've done well over 3,000 exams and reviewed another 1,000 exams.

Q      And Ms. Shulman, before today have you ever testified as an expert in
       court on these types of cases?

A      Yes.

Q      Approximately how many times have you testified in Hillsborough
       County as an expert?

A      Over 100 times.

Q      And do you also testify in other parts of the State or have you testified in other parts of the State?

A      Yes, I have.

Q      As an expert?

A      Yes.

Q      And where was that?

A      Polk County, Dade County, Pinellas County, Highlands County, Polk County.  I've also testified in Virginia.

(Respondent's Exh. 1, pp. 660-662).

Ms. Shulman also testified about an injury to the victim's hymen.

Q      Ms. Shulman, what were your findings of the examination that you did on Amanda Ramatoola?

A      On the genital examination, she had absence of hymenal tissue at 4:00. If you look at the hymen as a clock which we do as I'm looking at the patient, that is how we reference where any injury might occur or any finding.

Q      Can you describe to the jury what does that mean absence of hymenal tissue?

A      The hymen is the -- you have the external genitalia which is primarily the labia which is the protective area over the genitalia.  When that genitalia is spread, when the labia is spread, you have the area of the hymenal tissue which is the entrance into the vaginal cavity.  That tissue is usually thought to be in layman's terms like a ring into the vagina.  That tissue is usually very smooth without interruption.  In this -- I'm sorry --

Q      You said it's usually smooth without interruption?

A      Correct.

Q        What was it like in Amanda Ramatoola's case.

A        At the area of 4:00, there was no hymenal tissue.

Q        Would you describe what you saw as injury or potential trauma to the hymen?

A        It was indicative of a penetrating injury.  However, it was older, and time line or time of injury could not be established.

Q        When you say penetrating injury, what do you mean by that?

A        Just that had to be a penetrating injury to cause -- to cause that absence of the hymenal tissue.

Q        And you said that time could not be established?

A        Correct.  It was -- the area around it was well healed.  The area at 4:00, it went -- it was straight into the vaginal wall.  There was nothing between the vagina and the external genitalia at 4:00.

Q        Ms. Shulman, can you say for certain whether or not this penetration injury was caused by a penis or something else?

A        No.

Q        When you were getting the medical history from Amanda and you asked her about her period, did she indicate to you whether or not she used maxipads or tampons?

A        Pads.

Q        Did she indicate whether or not she used tampons?

A        She did not.

Q        Can you say in your opinion, Ms. Shulman, can you say whether or not this injury was caused by a fall or something like that?

A        In lack of any history of such an injury, no.  And this is not the usual finding with a simple fall.

Q       So in your opinion, Nurse Shulman, could this injury have come from anything other than penetration of the vaginal cavity?

A       No, not without some significant history of such a traumatic injury.

Q       And there was no history -- none of that history in this case?

A       None was given.

(Respondent's Exh. 1, pp. 675-678).

A review of the testimony establishes that Ms. Shulman was properly qualified as an expert witness and that her testimony was within the field of her expertise.  Since Ms. Shulman was properly qualified, it was not deficient performance for trial counsel to fail to object.  Any objection would have been overruled.  Therefore, this Ground fails.

**<u>Ground Eight:</u>**       Trial counsel was ineffective for having the Court suppress evidence of domestic violence.

In support of Ground Eight, Ramatoola argues that his trial counsel was ineffective for suppressing the domestic violence episode that gave rise to the report by AMR of the sexual abuse.  He states:

> AMR's name was on Petitioner's bank accounts and the Petitioner had discovered that AMR had withdrawn all of the Petitioner's money from his account.  Upon finding that AMR had withdrawn all of Petitioner's money from the bank, Petitioner went home and confronted AMR, an argument broke out between Petitioner and AMR.  The Petitioner's wife and AMR called the police on a claim of domestic violence.  It was only after the police arrived on the domestic violence call that AMR concocted her sexual abuse allegations to get rid of Petitioner so that AMR would not have to repay the money.

> Instead of capitalizing on this evidence of bias and motivation to fabricate the charges against Petitioner, trial counsel had this evidence suppressed. Competent counsel would have brought this evidence out at trial to establish AMR's bias and motivation to fabricate the charges against Petitioner.

(Dkt. #1, p. 32).

The post-conviction court held a hearing on this issue. Ms. Frederiksen-Cherry testified as follows:

> This case arose because there was a call to the local police department and the ground in the call was a domestic violence report. It was a 911 call that was placed by Mr. Ramatoola's wife. Upon responding to that domestic violence battery call, the alleged victim in this case, Amanda Ramatoola, who was the daughter and stepdaughter of the Ramatoola's, reported to the police the acts of alleged sexual battery and lewd and lascivious battery that had been occurring for the past several years. That was her first report.
>
> There was an allegation arising out of the arrest for the domestic violence battery by Mrs. Ramatoola that Mr. Ramatoola had slapped her face. That's how this whole case started. There were some other -- without going into the details of the case, there was some other information that I did not want coming out at Mr. Ramatoola's trial on the sex charges related to drugs. His drug use very shortly prior to and during the time that the police were there, and things of that nature. I did not want that information coming out because I felt it would prejudice Mr. Ramatoola at his sexual battery trial.
>
> I filed a motion in limine -- I believe it was uncontested -- as to those issues at least, which was granted by Judge Fuente. So I suppressed, I moved to keep that evidence out and that was granted.
>
> I believe that Mr. Ramatoola is now complaining in Ground 5 of his motion that he would have preferred that I bring out all that information because included in that dispute was Mr. Ramatoola's position that Amanda Ramatoola, the victim in the sexual battery charges, fabricated the sexual battery charges because Mr. Ramatoola had accused her of withdrawing money out of his banking account. Essentially, there was a dispute over money. And Mr. Ramatoola believed that if we brought in all this information about the prior domestic violence battery, the police coming, then we could have brought in the fact that Mr. Ramatoola believed that the motive for her fabricating the sexual battery charges upon the police arriving was money.

(Order on Post-Conviction Motion, Appx. C to Petition, Dkt. #1, pp. 95-96).

The post-conviction court made the following findings:

She testified that her efforts of preventing the evidence from being admitted was a trial strategic decision to keep the jury from hearing all about domestic violence.

On cross-examination,  Ms. Frederiksen-Cherry admitted the state did not charge Defendant with a domestic related offense and the state did not contest the motion in limine concluding that Defendant had been smoking marijuana in the garage around the time.

After reviewing the allegations, the testimony, evidence, and arguments presented at the August 16th, 2010, evidentiary hearing, the court file, and the record, the court finds Ms.  Frederiksen-Cherry's testimony to be credible. Therefore the court finds  Ms. Frederiksen-Cherry made a strategic decision to file the motion in limine to keep the jury from hearing all about the domestic violence evidence.   Consequently, the court finds Defendant cannot demonstrate that she acted deficiently when she made a strategic decision to file the motion in limine and keep out the evidence of domestic violence.

(Order on Post-Conviction Motion, Appx. C, Dkt. #1, pp. 96-97).

The post-conviction court's finding that the suppression of the domestic violence episode was a strategic decision on the part of trial counsel is well supported.  That finding of fact is binding on this Court.  Strategic decisions of trial counsel cannot be second guessed and will not support habeas relief.  *Cunningham v. Zant*, 928 F. 2d 1006 (11th Cir. 1991). Therefore, this Ground fails for lack of merit.

**Ground Nine:**      The trial was unfair and trial counsel was ineffective for the reasons stated in Grounds One through Eight.

In Ground Nine, Ramatoola contends that the cumulative impact of the proceeding eight Grounds entitle him to habeas relief.  But since the previous eight Grounds were found to have no merit, Ground Nine has no cumulative impact and must be denied.

## CONCLUSION

For the reasons set forth above, all of Petitioner's claims are without merit and will therefore be denied.

It is therefore ORDERED AND ADJUDGED that:

1.      The petition for writ of habeas corpus (Dkt. #1) is DENIED.

2.      The Clerk is directed to enter judgment in favor of Respondents and against the Petitioner, terminate any pending motions, and close this file.

### CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463

U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

**DONE** and **ORDERED** in Tampa, Florida on May 23, 2013.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies Furnished To**:
Counsel/Parties of Record

*F:\Docs\2013\13-cv-448.Ramatoola 2254*